IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No.  4:12-cr-00085 |
| | ) | |
| vs. | ) | |
| | ) | |
| ABELARDO RAMIREZ JUAREZ, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

## INTRODUCTION

On June 29, 2012, the government obtained a three-count indictment charging the

defendants, Donald Jensen and Abelardo Ramirez Juarez, with conspiracy to commit forced

labor between March 1, 2010, and October 17, 2011, in violation of 18 U.S.C. §§ 1589(a) and

1590(a); and alien smuggling on or about March 11, 2010, and on or about December 18, 2010,

both in violation of 8 U.S.C. § 1324(a)(2)(B)(iii).  On March 27, 2013, Mr. Ramirez Juarez

formally accepted responsibility for his actions in the offense by pleading guilty to the alien

smuggling charges under counts two and three, pursuant to a written plea agreement.  The Court

accepted his guilty pleas and adjudicated him guilty that same day.

The presentence report drafter, after grouping counts two and three together pursuant to

USSG §3D1.2(d), determined that Mr. Ramirez Juarez's base offense level under the advisory

sentencing guidelines is 12.  (PSR ¶26).  No other specific offense characteristics are applicable

to Mr. Ramirez Juarez in this offense.  After calculating Mr. Ramirez Juarez's criminal history

category as I (PSR ¶38), and applying a two-level reduction for acceptance of responsibility

(PSR ¶33), the presentence report drafter found a total offense level of 10 and an advisory

sentencing guideline range of 6 to 12 months of imprisonment, in zone B of the guidelines. (PSR ¶82). Mr. Ramirez Juarez respectfully argues that the statutory sentencing factors of 18 U.S.C. § 3553(a) support a finding by the Court that a "sufficient, but not greater than necessary" sentence under the circumstances of this case is a sentence of time served.

**SUMMARY OF THE LAW**

The Supreme Court held in *United States v. Booker* that the mandatory nature of the federal sentencing guidelines system violated the Sixth Amendment of the United States Constitution. 543 U.S. 220, 226-27 (2005). To remedy this, the Supreme Court modified the federal sentencing statute to make the sentencing guidelines truly guidelines – advisory, but not binding on the sentencing court. *Id*. at 245. Subsequent cases have affirmed the authority of the sentencing court to sentence within the range of choice dictated by the facts and applicable law of the case before it. *See Gall v. United States*, 552 U.S. 38, 59 (2007) (upholding a sentence outside the advisory guideline range as reasonable); *Kimbrough v. United States*, 552 U.S. 85, 100-107 (2007) (noting that sentencing courts may vary from the advisory guideline range based solely on policy considerations, including disagreement with the policy underlying the guidelines in a case); *Rita v. United States*, 551 U.S. 338, 351 (2007) (stating that a district court may consider arguments that "the Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a) considerations"). The result of this is that sentencing courts must "take account of" the advisory guideline range as part of all the sentencing goals and factors enumerated in 18 U.S.C. § 3553(a), but are no longer bound by the sentencing range indicated by the applicable guideline in the case. *Booker*, 543 U.S. at 261. "[T]he Guidelines are not the only consideration, [and] the district judge should consider all of the § 3553(a) factors" to fashion the

appropriate sentence.  *Gall*, 552 U.S. at 39.  As required by the Sentencing Reform Act, the

"overarching provision instruct[s] [the] district courts to 'impose a sentence sufficient, but not

greater than necessary' to accomplish the goals of sentencing, including 'to reflect the

seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the

offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from

further crimes of the defendant.'"  *Kimbrough*, 552 U.S. at 89 (quoting 18 U.S.C. § 3553(a)).

## ARGUMENT

Abelardo Ramirez Juarez is a 54-year-old salesman, operating on the border between the

United States and Mexico.  In 2012, he obtained legal permission to work and reside in the

United States, and he and his wife had been operating a small business in Brownsville, Texas,

selling Mexican artifacts and clothing.  For the past 20 years, he has worked primarily as a

salesman just across the border from Brownsville, in Matamoros, Mexico, selling the same types

of artifacts and clothing to tourists.  He was born into a stable family situation in Mexico, though

his father did have problems with alcohol abuse.  He is one of eight close children, and he has

been married for nearly 35 years with four children of his own, three of whom are now adults.

Mr. Ramirez Juarez, like many people in Mexico who live in or near border towns and

cities, has earned a living off of Americans and other tourists who come to Mexico.  Whether it

is by selling artifacts and souvenirs, or acting as a guide like he did in 2006, Mr. Ramirez Juarez

has always been able to support himself and his family by catering to the tourist trade.  The co-

defendant, Donald Jensen, was one such tourist that Mr. Ramirez Juarez met in early 2010.  Mr.

Jensen had come to Matamoros, Mexico claiming to be seeking a Mexican woman with whom to

have a relationship.  Due to his knowledge of English, Mr. Ramirez Juarez had an advantage

over the other Mexican vendors and salesmen who were jockeying to be the person to assist Mr. Jensen, who appeared to be an American with some money.  At first, Mr. Ramirez Juarez thought that Mr. Jensen was seeking a prostitute, but Mr. Jensen claimed that he was looking to establish a real relationship with the end goal of marrying a Mexican woman and helping her get legal papers in the United States.  Believing that Mr. Jensen was sincere, and hoping to make some money by assisting him, Mr. Ramirez Juarez made inquiries within the community, and a local waitress, A.C.J., indicated that she would be interested in marrying an American citizen so she could obtain legal status in the United States and escape her difficult life in Mexico.  Part of the arrangement would also involve Mr. Jensen sending money back to Mexico to help A.C.J.'s family.  Mr. Ramirez Juarez subsequently introduced A.C.J. to Mr. Jensen at a restaurant in Matamoros, and they appeared to be interested in one another.

Mr. Jensen then provided Mr. Ramirez Juarez with money with which to hire a smuggler to get A.C.J. across the border and into the United States so he could take her back to Iowa where he lived.  Mr. Ramirez Juarez found a local smuggler, provided him with the money from Mr. Jensen, and eventually drove A.C.J. to a house near the border where the smuggler's associates helped A.C.J. cross the Rio Grande River and into the United States, where the smuggler's associates and Mr. Ramirez Juarez eventually reunited her with Mr. Jensen.  Mr. Jensen and A.C.J. stayed at a hotel in Texas for a few days, before traveling to Nevada, Iowa where Jensen has a home.

In late 2010, Mr. Ramirez Juarez received a phone call from Mr. Jensen, indicating that things between him and A.C.J. had not worked out, and they were no longer together.  Mr. Jensen said he was interested in the same type of arrangement – a relationship with a Mexican

woman who would eventually marry him and obtain legal status in the United States – with another woman.  Mr. Ramirez Juarez again made inquiries within the community.  He spoke with an acquaintance of his, Leticia, about whether she knew of anyone interested in such an arrangement.  Leticia's friend, R.J.S., overheard the conversation and expressed an interest over the phone to Mr. Ramirez Juarez.  After some subsequent communication with Mr. Jensen, he again agreed to send money to R.J.S.'s family in Mexico as part of the arrangement, and also wired money to Mr. Ramirez Juarez to provide to her so she could take a bus from Mexico City to Matamoros to meet him.

In late November of 2010, Mr. Ramirez Juarez introduced Mr. Jensen to R.J.S. at a restaurant in Matamoros.  R.J.S. expressed some concerns to Mr. Ramirez Juarez about not being particularly attracted to Mr. Jensen, and that she was worried that Mr. Jensen would not honor the agreement to marry her so that she could obtain legal status in the United States.  Mr. Ramirez Juarez suggested to her that she could require Mr. Jensen to marry her before leaving the border, or she could back out of the arrangement, but R.J.S. wanted the money Mr. Jensen had agreed to send to her family, and did not want to back out at that point.  Mr. Ramirez, again utilizing funds from Mr. Jensen, hired the smuggler to cross R.J.S. into the United States where she eventually met up with Mr. Jensen at a hotel.  Mr. Jensen and R.J.S. spent a few weeks staying at different hotels and apartments in the southern United States, before eventually returning to Mr. Jensen's residence in Iowa.

In the early months of 2011, having left Mr. Jensen and having been staying with another individual that she met at a bar, A.C.J. was referred to a Des Moines based assistance agency.  The agency helped her move into a shelter, and put her in touch with law enforcement authorities

concerning her allegations about how Mr. Jensen had treated her in Iowa.  That investigation led

to the execution of a search warrant on Mr. Jensen's home in October of 2012, where R.J.S. was

located in the residence.  After interviewing R.J.S. and conducting some further investigation,

arrest warrants were issued for Mr. Jensen and Mr. Ramirez in late June of 2012.  Mr. Ramirez

Juarez was arrested at his Brownsville, Texas home on July 9, 2012, without incident, and was

subsequently transferred to Iowa to deal with this case.

The question now before the Court is what sentence Mr. Ramirez Juarez should receive

for his conduct in this case.  Mr. Ramirez Juarez understands the seriousness of his actions in

helping to facilitate the smuggling of the two women into the United States.  He has accepted

responsibility for breaking the law by entering a guilty plea to two counts of alien smuggling,

and by being cooperative with law enforcement authorities in the case.  Because an immigration

detainer was placed on him, he has been in custody for a year since his arrest in July of 2012,

serving that time almost entirely in the Polk County Jail.  He also accepted responsibility for his

conduct, knowing that he is likely to lose the immigration status he had just recently received,

and that he may never be allowed to legally reside in the United States in the future.

But Mr. Ramirez Juarez had no idea what may have been occurring between Mr. Jensen

and the two women once they reached Iowa.  He had very little contact with Mr. Jensen or either

woman once they left the border region where he resides.  To that end, he simply does not know

if Mr. Jensen was abusive toward either or both of the women, or if he utilized them as some sort

of captive labor for his domestic and/or professional life.  Mr. Ramirez Juarez always thought

that he had helped broker a mutually beneficial arrangement, wherein Mr. Jensen got to have a

relationship with a Mexican woman like he desired, and the women received money for

themselves and their families, a better life in the United States, and would eventually get to marry Mr. Jensen so they could then obtain legal status in the United States like they wanted. While Mr. Ramirez Juarez may have been naive and foolish by failing to question Mr. Jensen's expressed motive, such an arrangement is certainly not unheard of between American citizens and foreign nationals.  Only Mr. Jensen knows what his motives really were, and only he and the women know the truth about what may or may not have happened between them in Nevada, Iowa.  Suffice it to say that Mr. Ramirez Juarez was horrified to hear the allegations made by A.C.J. and R.J.S. about how Mr. Jensen treated them, and he would never have helped arrange their meetings with Mr. Jensen if he had any knowledge that Mr. Jensen intended to be abusive toward them in any way.  If Mr. Jensen's intent was to abuse the women in any fashion, he never indicated that to Mr. Ramirez Juarez, and Mr. Ramirez Juarez saw no signs to make it foreseeable to him that such conduct was likely to occur.

Indeed, an examination of Mr. Ramirez Juarez's personal history and characteristics further supports the fact that he was foolish and blind to any possible nefarious intent by Mr. Jensen, but rather thought he was helping the women and Mr. Jensen to all of their benefit, as noted above.  Mr. Ramirez Juarez has never been in trouble for anything before, not in the United States or Mexico.  He has lived a quiet, hard-working life.  He and his family are Pentacostal Christians, and many of them are active in the church.  He has always worked, whether it be in sales, construction, or laying mosaic tile.  He had to quit school after middle school to work to help support the family.  Like his father, he has struggled with alcohol abuse in the past, but has now been sober for over 10 years.  He has been active in the community, helping teach swimming to young men, and leading Alcoholics Anonymous meetings at

Mexican jails and juvenile facilities.  He has never used any illegal substances in his life.  He completed his required military service in Mexico over 30 years ago, and was in the United States legally during his offense conduct in this case.  He is not a smuggler, and had to obtain a smuggler's services, utilizing Mr. Jensen's money, to help get A.C.J. and R.J.S. into the United States.  It seems clear that Mr. Ramirez Juarez, in pursuit of what ended up being only a few hundred dollars for himself and his family, got involved in something that was outside of his realm of good sense.  But it also seems clear that his conduct in this case has been an aberration in what has otherwise been an exemplary life.  It certainly does not logically follow that a lengthy term of imprisonment is necessary for Mr. Ramirez Juarez to effectuate all the sentencing goals under 18 U.S.C. § 3553(a).

While the offense of alien smuggling is very serious under both federal criminal and immigration law, Mr. Ramirez Juarez has now been in custody, serving hard time in a county jail, for 12 months on this offense.  But for the immigration detainer placed upon him, he would appear to be a good candidate for pretrial release in light of his personal history and characteristics.  By all accounts, he has been cooperative with authorities, and has been a model inmate, acting as a mentor to some of the younger inmates at the jail, while also participating in substance abuse and other classes available to him.  He recognized that, by facilitating the smuggling of the women into the United States, he had broken the law.  And he accepted responsibility for his actions despite knowing that the consequences, in terms of both imprisonment and the collateral consequences to his immigration status, would place significant hardship upon his wife and remaining dependent child.  He did so because he understands that he broke the law and accepts that he must face the resulting consequences.

-8-

Furthermore, it is difficult to see why a longer sentence is necessary under the factors of 18 U.S.C. § 3553(a) when Mr. Ramirez Juarez's personal history and characteristics are taken into account.  A conviction on two counts of alien smuggling, with the 12 month term of imprisonment, a term of supervised release, and likely deportation from the United States, is certainly ample punishment for a 54-year-old first time offender who had been living legally inside the United States.  Such a sentence would promote respect for the law, be a just punishment, and provide both specific and general deterrent effect.  There appears to be little reason to believe that Mr. Ramirez Juarez poses any future threat to the public, and the sentence would be within the advisory sentencing guideline range, indeed at the top of the range, meaning there is little reason to fear that any unwarranted sentencing disparity would result from a time served sentence in this case for this defendant.  This is especially true when the only factor prohibiting the possibility of the imposition of a probationary sentence, which would otherwise be both statutorily authorized and available under the advisory sentencing guideline system, is the immigration detainer that has been placed on Mr. Ramirez Juarez.  The same detainer that has led to his pretrial detention in this case, and the same detainer that will limit his access to available corrective and rehabilitative treatment programs within the Bureau of Prisons if the Court decides an additional term of imprisonment is necessary for him.

Mr. Ramirez Juarez has accepted responsibility for breaking the law by helping smuggle A.C.J. and R.J.S. into the United States from Mexico.  His offense appears to be aberrant conduct in what has, in many ways, been an otherwise admirable, if sometimes difficult, life.  But he did the right thing, and showed respect for the law, by being cooperative with authorities in this case and accepting responsibility for what he did.  He has now served a year in jail for his

actions, during which time he has struggled with depression related to his offense.  Upon his

release from incarceration, he seeks only to go back, to the extent possible, to the type of life he

had prior to the events of 2012.  Based on his history and characteristics, it does not appear

likely that the Court will have to worry about Mr. Ramirez Juarez ever engaging in any type of

similar conduct again in the future.  Because of this, and all the factors mentioned above, Mr.

Ramirez Juarez respectfully requests that the Court impose a sentence of time served in this case.

FEDERAL PUBLIC DEFENDER'S OFFICE
Capital Square, Suite 340
400 Locust Street
Des Moines, IA 50309-2353
Phone: 515-309-9610
Fax: 515-309-9625
E-mail: joe_herrold@fd.org

 /s/ Joseph Herrold
Joseph Herrold
Assistant Federal Public Defender
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE
I hereby certify that on July 3, 2013, I electronically
filed this document with the Clerk of Court using the
ECF system which will serve it on the appropriate
parties.
            /s/ Theresa McClure