UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CRIMINAL NO. 4:12-CR-085 |
| v. | ) | |
| | ) | |
| DONALD DEAN JENSEN, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its undersigned counsel, respectfully submits the following in advance of sentencing.

**I.    Introduction**

   **A.    Procedural History**

On June 29, 2012, a three-count Indictment was filed, charging Defendant, Donald Dean Jensen, with one count of conspiracy to commit forced labor and two counts of alien smuggling. Subsequent to his arrest, Jensen was conditionally released from custody pending trial. On March 21, 2013, Donald Dean Jensen pled guilty to alien smuggling as charged in Counts Two and Three of the Indictment. The Court accepted the plea and adjudicated him guilty.

   **B.    Offense Conduct**

On or about February of 2010, Defendant Donald Dean Jensen hired Abelardo Ramirez Juarez (Ramirez Juarez), to locate a Mexican female willing to marry and live with him in the United States.

On or about February of 2010, Ramirez Juarez approached ACJ, an approximately 38 to 39 year old female who was a citizen and national of Mexico, in Matamoros, Mexico. The defendant asked ACJ if she would be willing to marry an American man in exchange for the ability to lawfully reside in the United States.

On or about March of 2010, Ramirez Juarez introduced ACJ to Donald Dean Jensen, at a restaurant in Matamoros, Mexico.  During their initial meeting, Donald Dean Jensen, advised ACJ that he wanted to take her to the United States and marry her.  Their conversation was translated by Ramirez Juarez.

On or about March 7, 2010, Donald Dean Jensen paid Ramirez Juarez $4,500 to smuggle ACJ from Mexico into the United States.  Jensen was aware ACJ had not received prior official authorization to enter the United States.

On or about March 8, 2010, Ramirez Juarez drove ACJ to a residence near the border between Mexico and the United States.  After arriving at the residence, Ramirez Juarez introduced ACJ to several individuals who physically assisted ACJ in crossing the border near Brownsville, Texas.  Immediately after crossing the border, ACJ met with Ramirez Juarez at a business in Brownsville, Texas.  During this meeting, Ramirez Juarez introduced ACJ to another individual who transported ACJ to a residence in Brownsville, Texas.   ACJ was later picked up at the residence by her sister.   ACJ's sister drove ACJ a nearby hotel where she met with Jensen. ACJ stayed at the hotel with Jensen for two to three days.

After a few days, Jensen and ACJ traveled north in Jensen's pickup truck.  On or about March 15, 2010, Jensen and ACJ arrived at Jensen's residence in rural Nevada, Iowa.  After arriving in Iowa, ACJ felt very isolated.  ACJ recalled feeling like a prisoner who could not leave the house or interact with anyone.  ACJ does not speak English.  ACJ would spend her days cooking and cleaning for Jensen.

Jensen took pills that made him want to have sex on a daily basis.  Jensen would insist ACJ drink alcohol with him and have sex whenever he wanted.  If ACJ refused to have sex, Jensen would insult her and threaten to send her back to Mexico.  Jensen informed ACJ that she

would be put in jail and deported if she called the police or left his residence without his consent. ACJ recalls having sex with Jensen on several occasions while crying and upset as a result of Jensen's insults.

When ACJ continued to refuse to have sex, Jensen locked ACJ out of the house. ACJ recalled sleeping in a shed where Jensen stored fertilizer for his sod business. When ACJ knocked on the door in the middle of the night in an effort to get Jensen to let her in, Jensen would only allow ACJ back into the house when she agreed to have sex with him. ACJ estimated being locked out of the house on 3 separate occasions between May and November of 2010.

From June to September of 2010, Jensen required ACJ to work at his landscaping business. ACJ watered sod and plants, spread straw over seed and helped clean up at various job sites. ACJ worked four days a week from 7:00 a.m. to 7:00 p.m. ACJ advised Jensen paid her $200 on only one occasion for this work.

Jensen made bi-monthly payments of $80 to her daughter, VCCJ. Jensen utilized Western Union at the Super-K in Ames, Iowa to transfer the money to her daughter. If ACJ agreed to have sex with him, Jensen would occasionally buy clothing and other personal items for ACJ.

In October or November of 2010, ACJ fled Jensen's residence. ACJ was upset with the manner in which Jensen was treating her. ACJ was also angry because Jensen failed to obtain her "papers" as promised. ACJ stayed with a Mexican man named Jose she met at a Mexican bar in Ames. ACJ remained at this residence until March or April of 2011. Shortly thereafter, ACJ called LUNA. LUNA helped ACJ move to a woman's shelter on April 25, 2011.

On or about November of 2010, Donald Dean Jensen again hired Ramirez Juarez to locate a Mexican female willing to marry and live with him in the United States. Jensen agreed to pay Ramirez Juarez incrementally for assisting him in locating a Mexican woman.

On or about November of 2010, Ramirez Juarez spoke with RJ, an approximately 35 to 36 year old female who was a citizen and national of Mexico, about whether she would be willing to marry an American man in exchange for the ability to lawfully reside in the United States. Ramirez Juarez advised RJ that the older American male would send $400 per month to RJ's family in Mexico in addition to funds RJ would receive directly. In late November 2010, Ramirez Juarez provided RJ with bus fare to travel from Mexico City, Mexico to Matamoros, Mexico.

On or about November 27, 2010, Ramirez Juarez drove RJ to a residence near the border between Mexico and the United States. Upon arrival at the residence, Ramirez Juarez introduced RJ to several individuals who physically assisted RJ in crossing the border near Brownsville, Texas. Immediately after crossing the border, RJ met with Ramirez Juarez. Ramirez Juarez took RJ to a McDonald's restaurant in Brownsville, Texas where Donald Dean Jensen was waiting.

After spending one night together at a motel, Jensen took RJ to the Golf View II apartments on South Padre Island, Texas where they stayed for approximately 20 days. While staying at the apartment, Jensen would regularly drink alcohol. Jensen would become angry if RJ did not drink with him. After three days at the apartment, RJ got drunk and had sex with Jensen. Jensen would often remind RJ that he had paid for her to be smuggled to the U.S. and RJ no longer had a job in Mexico. RJ did not run away in Mexico because she feared there would be trouble for her and her family if she did so.

Jensen would insist on having sex with RJ approximately every other day. While RJ would initially resist, eventually she would give in to Jensen's demands. Jensen would take a pill prior to having sex. While Jensen understood some Spanish, RJ and Jensen were only able to communicate on a very basic level. They would instead utilize an on-line translation program to engage in meaningful communication. Towards the end of their stay in Mexico, Jensen informed RJ she was not being affectionate enough toward him and that he was thinking of sending her back to Mexico. Jensen later promised to marry RJ after their arrival in Iowa and both signed a pre-nuptial agreement.

After approximately twenty days in Texas, Jensen and RJ traveled to Iowa. Upon their arrival in Iowa, Jensen took RJ to his residence, which RJ recalled as being in a rural area. RJ was required to clean the residence and act as Jensen's housekeeper. RJ recalled feeling isolated. Jensen asked RJ to sleep with him in his bed during her first night in Iowa. RJ agreed as there was nowhere else to sleep. During the Christmas season 2010, RJ recalls traveling with Jensen to a Wal-Mart in Ames where Jensen utilized Money Gram to send $4,500 to Abel for smuggling RJ to the U.S.

RJ recalled a lonely existence at Jensen's residence indicating her only friends were a dog (which Jensen bought at her request), a cat and a fish. RJ became friends with a woman named Ida LNU whom she met at the Wal-Mart in Ames where Jensen would take her. Ida's husband, Sergio, later worked for Jensen on the sod farm. RJ positively identified a photograph of Sergio Carlos Ramirez-Salas at Ida's husband.

Jensen often took RJ to various landscaping job sites to work cleaning-up and watering. RJ stated she worked 8-hour days from August to October of 2011. Jensen only paid RJ for this work on two occasions: $500 for August and $300 for September. Jensen sent approximately

$400 per month to her family in Mexico via Money Gram. These wires began in December 2010 and continued on a monthly basis with the exception of September of 2011, when RJ ran away to stay with Ida for a few weeks.

After running away in September of 2011, RJ only returned when Jensen promised to marry her in Mexico in December of 2011. At this point, RJ wanted to return to Mexico and planned to remain in Mexico after their arrival. RJ was detained by HSI agents on October 17, 2011 during the execution of a federal search warrant at Jensen's residence.

### C. Advisory Guideline Computation

The Presentence Report calculates Defendant's total offense level as 17, and a criminal history category of I, for a guideline calculation of 24-30 months. The Defendant has objected to the several aspects of the presentence investigation report. More specifically, Defendant objects to:

1. The accuracy of the factual circumstances set forth in the Offense Conduct and Part F Sections of the presentence investigation report.

2. The applicability of the two-level aggravating role adjustment, pursuant to USSG Section 3B1.1(c).

3. The applicability of a specific offense characteristic adjustment for involuntarily detaining an alien through coercion of threats, pursuant to USSG Section 2L1.1(b)(8)(A).

4. The applicability of a three-level downward adjustment for committing the offense other than for profit, pursuant to USSG Section 2L1.1(b)(1).

5. The ability of the defendant to pay a fine.

The Government contends the facts of this case support the application of the aggravating role adjustment, the specific offense characteristic for involuntarily detaining an alien through coercion of threats. The Government disputes the applicability of a three-level downward

adjustment for committing the offence other than for profit.  The Government believes the Defendant has the ability to pay a $5,000 fine.  In support of these contentions, the government will call ACJ and RJ as witnesses at Defendant's sentencing hearing.  The government may also call Special Agent Ash Ivers, Homeland Security Investigations, to testify.

### III.    ARGUMENT

Title 18, United States Code, Section 3553(a) directs the Court to consider the following factors in determining the particular sentence to be imposed:

>   (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>   (2)    the need for the sentence imposed—
>
>   > (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   >
>   > (B)    to afford adequate deterrence to criminal conduct;
>   >
>   > (C)    to protect the public from further crimes of the defendant; and
>   >
>   > (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
>   (3)    the kinds of sentences available;
>
>   (4)    the kinds of sentence and the sentencing range established for [. . .] the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [. . .] issued by the Sentencing Commission[;]
>
>   (5)    any pertinent policy statement [. . .] issued by the Sentencing Commission[;]
>
>   (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a). The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" above. *Id.*

Based upon the nature and circumstances of this case, the defendant's criminal history, and the other factors listed in 18 U.S.C. § 3553(a), the United States recommends Jensen receive a sentence of 24 months.

**IV. CONCLUSION**

For the reasons stated above, the United States respectfully asks the Court to impose a sentence of 24 months.

                                                          Respectfully Submitted,

                                                          Nicholas A. Klinefeldt
                                                          United States Attorney

                                        By:  */s/ Jason T. Griess*
                                                          Jason T. Griess
                                                          Assistant United States Attorney

                                                          U. S. Courthouse Annex, Suite 286
                                                          110 East Court Avenue
                                                          Des Moines, Iowa  50309
                                                          Tel: (515) 473-9300
                                                          Fax: (515) 473-9288

CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2013, I
electronically filed the foregoing with the
Clerk of Court using the CM ECF system. I hereby
certify that a copy of this document was served
on the parties or attorneys of record by:

\_\_\_\_U.S. Mail  _____ Fax  \_\_\_\_\_Hand Delivery

 X \_\_\_ECF/Electronic filing  \_\_\_\_Other means

UNITED STATES ATTORNEY

By: */s/*
      Paralegal Specialist